```
                    UNITED STATES DISTRICT COURT
                      DISTRICT OF CONNECTICUT

TICKETNETWORK, INC.,               :
                                   :
     Plaintiff,                    :
                                   :
v.                                 :    CASE NO. 3:15CV417(RNC)
                                   :
DEM TICKETING, LLC,                :
                                   :
     Defendant.                    :
```

RECOMMENDED RULING AFTER HEARING ON DAMAGES

Plaintiff, TicketNetwork, Inc., commenced this breach of contract action against defendant, DEM Ticketing, LLC, on March 23, 2015, and served the complaint pursuant to Connecticut General Statutes § 34-233(c).[1] (Doc. #1, 8.) Defendant failed to appear or respond. On June 9, 2015, plaintiff filed a motion for entry of default pursuant to Federal Rule 55(a), which the Clerk of Court granted on June 11, 2015.[2] (Doc. #9, 10.) Thereafter, because plaintiff planned to amend the complaint to add additional claims, it moved to set aside the default. (Doc. #11.) The Clerk of Court granted the motion. (Doc. #12.)

On October 26, 2015, plaintiff filed an amended complaint and served it on the Secretary of State. (Doc. #14, 16.)

---

[1] Section 34-233(c) provides that "[a] foreign limited liability company, by transacting business in this state without a certificate of registration, appoints the Secretary of the State as its agent for service of process with respect to a cause of action arising out of the transaction of business in this state." (Doc. #8, 16.)

[2] Plaintiff served the motion for default entry on the Secretary of State. (Doc. #30.)

Defendant failed to appear or respond.  Plaintiff filed a motion for entry of default on November 30, 2015, which the Clerk of Court granted the next day. (Doc. #17, 18.)  On December 9, 2015, plaintiff filed a motion for default judgment pursuant to Federal Rule 55(b). (Doc. #19.)  Plaintiff served both motions on the Secretary of State. (Doc. #31, 32.)  Again, defendant did not respond.

On February 9, 2016, United States District Judge Robert N. Chatigny granted the motion for default judgment as to liability only and referred the case to me for a hearing on damages. (Doc. #21, 22.)  I scheduled a hearing for April 7, 2016. (Doc. #23.)  At plaintiff's request, I rescheduled the hearing to April 20, 2016. (Doc. #25.)  Plaintiff gave defendant notice of the court's scheduling order and plaintiff's memorandum of law by serving the Secretary of State as well as by sending a copy by Federal Express to defendant's last known address. (Doc. #27, 28.)  Defendant did not appear at the hearing on April 20, 2016.

    I.    <u>Facts</u>

A default having entered against defendant, the well-pled factual allegations of plaintiff's amended complaint are deemed admitted.  <u>See</u> <u>Au Bon Pain Corp. v. Artect, Inc.</u>, 653 F.2d 61, 65 (2d Cir. 1981).  Plaintiff's Chief Financial Officer, Christopher Hummer, testified at the hearing on damages and

offered additional testimony by way of affidavit. (Hummer Aff., Doc. #29.)

     A.   <u>The Parties' Agreement</u>

Plaintiff, a software company, provides an online secondary marketplace known as the "Exchange" for tickets to live entertainment events. (Am. Compl. ¶ 6.)  Defendant, a secondary market ticket broker, acquires and resells tickets. (Am. Compl. ¶ 7.)

On or about November 25, 2014, defendant entered into a "TicketNetwork End-User License and Services Agreement" ("License Agreement") with plaintiff. (Am. Compl. ¶ 8; Doc. #29-1.)  Section 4(b) of the License Agreement gives defendant a non-exclusive license to access plaintiff's Exchange to list tickets for sale to third parties, such as end-user consumers. (Am. Compl. ¶ 9; Doc. #29-1, p. 5.)  The License Agreement incorporates by reference the TicketNetwork Broker Guidebook (the "Guidebook").[3]  Together, the License Agreement and the Guidebook impose valid and binding contractual obligations upon defendant. (Am. Compl., ¶ 11.)

---

[3]Specifically, § 3(b) of the License Agreement provides that defendant is prohibited from engaging in any conduct deemed inappropriate as described in the Guidebook. (Am. Compl. ¶ 10; Hummer Aff., Doc. #29-1, p. 3.)

B.   2015 Super Bowl Orders

The 2015 Super Bowl took place on February 1, 2015. (Am. Compl. ¶ 13.)  Defendant listed and sold Super Bowl tickets directly on the Exchange and also on SeatGeek.com, a ticket search engine.[4] (Am. Compl. ¶¶ 13, 14.)  Defendant did not fulfill Super Bowl ticket orders for 17 customers who visited the Exchange directly and 4 customers who accessed the Exchange through SeatGeek.com. (Am. Compl. ¶ 15; Hummer Aff., Doc. #29, ¶ 11.)  Although these customers

> were apparently able to recoup their purchase prices through measures with their credit card companies, many of them turned to TicketNetwork looking for assistance with replacement tickets and for additional recoveries.  TicketNetwork had to directly aid those unhappy customers, make payments to them pursuant to the guarantees, and in several instances had to remit additional payments to address their complaints that they were unable to attend the Super Bowl and the expenses they incurred in connection with this event that they were unable to attend.

(Hummer Aff., Doc. #29, ¶ 15; Am. Compl. ¶ 15.)

The License Agreement and Guidebook prohibit a broker from failing to fulfill ticket orders, and impose additional costs and penalties in the event of such a failure. (Am. Compl. ¶ 17; Hummer Aff., Doc. #29, ¶ 12; Doc. #29-1, p. 3; Doc. #29-2, p. 22.)  Specifically, the Guidebook provides:

---

[4]Pursuant to the Guidebook, the TicketNetwork Direct Program ("TND"), in which defendant participated, "maximizes a Broker's inventory exposure on TicketNetwork®'s affiliated websites, resulting in a greater opportunity for sales for the Broker." (Doc. #29-2, p. 17.)

4

> When a Broker "Accepts" an order and then fails to deliver those precise tickets or better tickets to the Customer, TicketNetwork® expects that the Broker will fill the Customer's order with same or better tickets regardless of the current price. The additional cost may not be passed on to the Customer. If the Broker refuses to comply . . . TicketNetwork® will then fill the Customer's order with equivalent or better tickets regardless of the current price. The Broker will be responsible to repay TicketNetwork® for the entire price of those newly obtained tickets, regardless of whether they cost more than the originally accepted order. This amount will be added to the Broker's next TND invoice. If the newly obtained tickets cost less than the original order, TicketNetwork® reserves the right to keep the difference in cost to compensate for the additional workload required to re-fill the order.

(Hummer Aff., Doc. #29, ¶ 13; Doc. #29-2, p. 22.)

Pursuant to the Guidebook, plaintiff offers customers a 125% refund ("TicketNetwork Guarantee") for unfulfilled tickets purchased directly through the Exchange.[5] (Am. Compl. ¶ 18(a); Hummer Aff., Doc. #29, ¶ 13; Doc. #29-2, p. 22.) For unfulfilled orders purchased through SeatGeek.com, plaintiff offers a 200% refund ("SeatGeek Guarantee").[6] (Am. Compl. ¶ 18(b); Hummer Aff., Doc. #29, ¶ 14(b).) These refunds are intended to compensate customers for the original order amount as well as for any financial hardship, inconvenience, and

---

[5] For example, if a customer purchases a $100 ticket on the Exchange and the order is not fulfilled, the customer is entitled to a $125 refund. (Am. Compl. ¶ 18(a); Hummer Aff., Doc. #29, ¶ 14(a).)

[6] For example, if a customer purchases a $100 ticket on SeatGeek.com and the order is not fulfilled, the customer is entitled to a $200 refund. (Am. Compl. ¶ 18(b); Hummer Aff., Doc. #29, ¶ 14(b).)

frustration as a result of the failure to fulfill the order. (Am. Compl. ¶ 18; Hummer Aff., Doc. #29, ¶ 14; Doc. #29-2, p. 22.)

In addition to the 125% TicketNetwork Guarantee, defendant is required to pay plaintiff an additional 25% of the original order amount for unfulfilled tickets purchased directly through the Exchange. (Am. Compl. ¶ 18(c); Hummer Aff., Doc. #29, ¶ 14(c); Doc. #29-2, p. 22.)  This additional 25% is intended to offset the costs reasonably related to plaintiff's time and effort spent finding replacement tickets, negotiating customer resolutions, and managing reputational harm.[7] (Am. Compl. ¶ 18(c); Hummer Aff., Doc. #29, ¶ 14(c); Doc. #29-2, p. 22.) Defendant is not required to pay this additional 25% for unfulfilled orders placed through SeatGeek.com. (Hummer Aff., Doc. #29, ¶ 14(c).)

Plaintiff fully performed its obligations under the License Agreement and Guidebook. (Am. Compl. ¶ 22.)  Defendant breached its contractual obligations by failing to fulfill ticket orders and refusing to pay plaintiff the amounts due as a result of those failures. (Am. Compl. ¶ 23.)  Hummer calculated the total amount owed by defendant to be $115,542.40. (Hummer Aff., Doc.

---

[7]For example, a broker who fails to fulfill a $100 customer order purchased directly through the Exchange is required to pay plaintiff an additional $25. (Am. Compl. ¶ 18(c); Hummer Aff., Doc. #29, ¶ 14(c).)

#29, ¶ 18.)  Specifically, defendant has failed to pay plaintiff $44,920.37 paid to customers to honor the 125% TicketNetwork Guarantee, and for other claims by those customers arising from defendant's failure to deliver the tickets; $32,541.60 plaintiff paid to customers to honor the 200% SeatGeek Guarantee; and $38,080.43, representing 25% of the total order amounts for unfulfilled tickets purchased directly through the Exchange. (Am. Compl. ¶ 24; Hummer Aff., Doc. #29, ¶ 18, Ex. 3, 4.)

      C.    Chargebacks

Plaintiff's second breach of contract claim seeks to recover damages for certain unpaid invoices. (Am. Compl. ¶¶ 31-42; Ex. 5, 6.)

In early 2015, plaintiff generated valid invoices to defendant for the fees defendant incurred when selling tickets on the Exchange. (Am. Compl., ¶ 36; Hummer Aff., Doc. #29, ¶ 22.)  Defendant agreed that payment of its obligations to plaintiff would be processed automatically by credit card or automated clearinghouse ("ACH") transaction at the time of an invoice's creation. (Am. Compl. ¶ 32.)  Defendant also agreed to maintain two valid credit cards and/or bank accounts for processing such payments.[8] (Am. Compl. ¶ 35.)  Plaintiff notified

---

[8] Section 3(b) of the License Agreement provides that defendant's use of plaintiff's software can be terminated for cause or no reason. (Doc. #29-1, p. 3.)  Termination for cause includes "non-payment" by defendant. (Doc. #29-1, p. 3.)

defendant of the invoices now at issue and automatically processed payment via 11 separate ACH transactions. (Am. Compl. ¶ 36; Hummer Aff., Doc. #29, ¶ 22.)  The transactions were rejected for insufficient funds. (Am. Compl. ¶ 37; Hummer Aff., Doc. #29, ¶ 23.)  Plaintiff then charged the Visa credit card that defendant had authorized for such payments. (Am. Compl. ¶ 38; Hummer Aff., Doc. #29, ¶ 24.)

In June 2015, plaintiff learned that defendant initiated chargebacks with Visa's merchant processor to contest the charges. (Am. Compl. ¶ 39; Hummer Aff., Doc. #29, ¶ 25.) Defendant's contesting of the charges was without any valid basis, unjustified, and inappropriate. (Am. Compl. ¶ 40.)  As a result of defendant's contesting the payments, Visa's merchant processor reversed the 11 charges and deducted those funds from plaintiff's account. (Am. Compl. ¶ 41.)  Using the Visa "Merchant Notification(s) of Denial," Hummer calculated the amount of damages caused by defendant's chargebacks to be $35,405.22. (Am. Compl. ¶ 42; Hummer Aff., Doc. #29, ¶ 27, Ex. 6, 7.)

   II.  Discussion

       A.  Breach of Contract

Under Connecticut law, "[t]he elements of a breach of contract are formation of an agreement, performance by one party, breach of the agreement by the other party and damages."

United Rentals, Inc. v. Price, 473 F. Supp. 2d 342, 346 (D. Conn. 2007).[5]  Here, plaintiff's allegations, which are admitted by virtue of the default, establish all of the elements of breach of contract.  Specifically, the parties entered into the License Agreement, and plaintiff performed its obligations under the agreement.  Defendant breached the agreement by failing to fulfill 21 Super Bowl ticket orders and refusing to pay plaintiff the amount due as a result of those failures.  Defendant also breached the agreement by initiating chargebacks on 11 valid charges.  Plaintiff suffered damages as a result of defendant's breaches.

      B.    Unjust Enrichment

Plaintiff's amended complaint alleges breach of contract and unjust enrichment.  At the hearing on damages, plaintiff's counsel explained that plaintiff is not pursuing both claims simultaneously.  Rather, the two counts were pled in the alternative.  Because plaintiff succeeds on its breach of contract claim, the court need not consider the unjust enrichment claim.  See Laser Contracting, LLC v. Torrance Family Ltd. P'ship, 108 Conn. App. 222, 229 (2008) (explaining that

---

[5]Defendant consented to personal jurisdiction and venue in Connecticut.  The License Agreement provides that "all matters or issues related thereto shall be governed by the laws of the State of Connecticut without giving effect to any choice of law provisions.  Each of the parties hereby submits to the exclusive jurisdiction of the Federal and State courts residing in Hartford County, Connecticut." (Doc. #29-1, p. 13.)

defendant "cannot be held liable simultaneously for breach of an express contract and an implied in law contract governing the same subject matter"); Russell v. Russell, 91 Conn. App. 619, 638 (2005) (unjust enrichment and breach of contract are mutually exclusive theories of recovery).

   C. Damages

 Plaintiff requests, and has proven, that defendant's breaches caused plaintiff $150,947.62 in compensatory damages. See O'Hara v. State, 218 Conn. 628, 642 (1991) ("The general rule of damages in a breach of contract action is that the award should place the injured party in the same position as [it] would have been in had the contract been performed.") (internal quotation marks omitted). I recommend that plaintiff be awarded compensatory damages in the requested amount of $150,947.62.

 Plaintiff also requests prejudgment interest at a rate of 10% per year. See Conn. Gen. Stat. § 37-3a ("[I]nterest at the rate of ten per cent a year, and no more, may be recovered and allowed in civil action . . . as damages for the detention of money after it becomes payable . . . .").

> To award § 37-3a interest, two components must be present. First, the claim to which the prejudgment interest attaches must be a claim for a liquidated sum of money wrongfully withheld and, second, the trier of fact must find, in its discretion, that equitable considerations warrant the payment of interest . . . .

Whitney v. J.M. Scott Associates, Inc., 2016 WL 1317681, at *9 (Conn. App. Apr. 15, 2016).  "Prejudgment interest pursuant to § 37-3a has been applied to breach of contract claims for liquidated damages, namely, where a party claims that a specified sum under the terms of a contract, or a sum to be determined by the terms of the contract, owed to that party has been detained by another party."  Ceci Bros. v. Five Twenty-One Corp., 81 Conn. App. 419, 427 (2004).  Here, plaintiff's claim is for a liquidated sum of money wrongfully withheld by defendant and equitable considerations warrant the payment of interest.  I recommend that plaintiff be awarded prejudgment interest at a rate of 10% per year.

After concluding that plaintiff is entitled to prejudgment interest, the court next must determine when interest began to run.  See Patron v. Konover, 35 Conn. App. 504, 517 (1994) ("If the trial court determines that one party has wrongfully detained funds, it must next determine the date the wrongful detention began.  Where the claim rests on a breach of contract, statutory interest accrues from the date the contract was breached.").  Plaintiff proposes calculating prejudgment interest on the damages for the unfulfilled Super Bowl orders from February 4, 2015--the date the invoices for these orders

11

became due and payable to plaintiff.[9]  With regard to the chargebacks, plaintiff submits that prejudgment interest should be calculated from June 10, 2015--the date defendant initiated the improper chargebacks. (Hummer Aff., Doc. #29, ¶ 27; Ex. 6.)

Plaintiff's proposed dates and interest rate are reasonable.  Prejudgment interest on the damages arising from the Super Bowl orders should be calculated from February 4, 2015 until the date judgment is entered, and prejudgment interest on the damages resulting from the chargebacks should be calculated from June 10, 2015 until the date judgment is entered.

III. Conclusion

Based on the foregoing, I recommend that plaintiff be awarded damages of $150,947.62, plus prejudgment interest as set forth above.

Any party may seek the district court's review of this recommendation.  See 28 U.S.C. § 636(b) (written objections to proposed findings and recommendations must be filed within fourteen days after service of same); Fed. R. Civ. P. 6(a), 6(d)

---

[9] Hummer testified that at the latest, customers must have purchased tickets to the Super Bowl by February 1, 2015--the date of the event.  He explained that purchases made on or before February 1, 2015 would have been invoiced and charged to defendant's ACH or credit card account by no later than February 4, 2015.  Although invoices for Super Bowl tickets purchased prior to February 1, 2015 would have been sent to defendant and charged to its ACH or credit card account prior to February 4, 2015, Hummer gave defendant the benefit of the doubt when calculating damages by using the latest possible invoice date for these purchases.

& 72; Thomas v. Arn, 474 U.S. 140, 155 (1985); Rule 72.2 of the Local Rules for United States Magistrate Judges, United States District Court for the District of Connecticut; Frank v. Johnson, 968 F.2d 298, 300 (2d Cir. 1992) (failure to file timely objections to Magistrate Judge's recommended ruling waives further review of the ruling).

    Dated this 2nd day of May, 2016 at Hartford, Connecticut.

                               _____/s/_____
                               Donna F. Martinez
                               United States Magistrate Judge